UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATTI HOBAN and TERRY HOBAN, doing business as Valley Bowl,<br><br>Plaintiffs,<br><br>v.<br><br>NOVA CASUALTY COMPANY,<br><br>Defendant. | No. 1:17-cv-00286-DAD-SKO<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>(Doc. Nos. 17, 23) |

This matter comes before the court on the parties' cross motions for summary judgment. A hearing on the motions was held on June 19, 2018.[1] Attorney Kevin Pollack appeared on behalf of plaintiffs while attorney Stephen Ellingson appeared on behalf of defendant. Following oral argument, the matter was taken under submission. For the reasons given below, the court will grant plaintiffs' motion for summary judgment, and will deny in part and grant in part defendant's motion for summary judgment.

/////

/////

---

[1] On February 28, 2017, defendant removed this action to this federal court on the basis of diversity jurisdiction, 28 U.S.C. § 1332. (Doc. No. 1. at 1—2.)

1

**BACKGROUND**

The facts of this case are essentially undisputed.[2] Plaintiffs own and operate Valley Bowl, a bowling center located at 12829 Highway 145, Madera, California. (Doc. No. 35-1 at 1.) On June 3, 2016, two roof trusses that helped support the roof of Valley Bowl (Truss Line 2 and Truss Line 5) failed. (*Id.* at 2.) These truss failures caused the building ceiling, overhead monitors, and disco ball to drop approximately six to ten inches, and also caused ceiling tiles and a layer of insulation to fall to the tabletops and counters below. (*Id.*) As a result of the truss failures, the ceiling fell to a height lower than it was originally constructed. (*Id.*) Additionally, the truss failures caused damages to at least one of Valley Bowl's exterior walls. (*Id.* at 3.) A general contractor named Tom Powers and Madera County Building Inspector Harry Hinton inspected the damage to Valley Bowl on the same day the trusses failed, June 3, 2016. (*Id.*) Madera County immediately ordered the business closed for public safety reasons until the necessary repairs could be completed. (*Id.* at 3–4.) Plaintiffs hired Powers to shore up the roof support system and prevent a complete collapse. (*Id.* at 4.) Following Powers' direction, the plaintiffs installed temporary braces that same day in order to prevent a complete collapse. (*Id.* at 5.) Powers performed interim repairs between late June 2016 and July 2016 to shore up the building's roof. (*Id.*) Following the shoring by Powers, plaintiffs were able to re-open the bowling alley to the public. (Doc. No. 37 at 7.)

Plaintiffs had a commercial insurance policy with defendant in place on June 3, 2016. (Doc. No. 35-1 at 5.) The policy affords coverage for all direct physical losses unless excluded or limited. (*Id.* at 5–6.) While damages caused by collapse are typically excluded from coverage,

/////

---

[2] The court notes that plaintiffs indicated they dispute nearly every fact defendant set forth in its statement of undisputed material facts. (*See* Doc. No. 37.) Upon review, however, it is clear the facts themselves are not disputed. Rather, plaintiffs dispute the legal significance to be attributed to those facts. The court will therefore rely on the facts as undisputed as to the specific fact expressed. (*See, e.g.*, Doc. No. 37 at 11–13) (statement of undisputed fact notes that structural engineer Michael Jundt prepared a report and recounts what the report said, but plaintiffs dispute the significance and accuracy of Jundt's report). The court understands plaintiffs to be disputing the significance of these facts and the conclusions that can reasonably be drawn therefrom, and bears that in mind throughout its analysis of the pending motions.

plaintiffs purchased additional coverage specifically to provide protection in the event of collapse. (*Id.* at 6.) The relevant part of the "Additional Coverage – Collapse" provision reads as follows:

**D. Additional Coverage – Collapse**

The coverage provided under this Additional Coverage, Collapse, applies only to an abrupt collapse as described and limited in D.1. through D.7.

1. For the purpose of this Additional Coverage, Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

2. We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

> a. Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;
>
> b. Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;
>
> c. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.
>
> d. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:
>
>> (1) A cause of loss listed in 2.a. or 2.b;
>>
>> (2) One or more of the "specified causes of loss";
>>
>> (3) Breakage of building glass;
>>
>> (4) Weight of people or personal property; or
>>
>> (5) Weight of rain that collects on a roof.

* * *

3. This Additional Coverage – Collapse does not apply to:

> a. A building or any part of a building that is in danger of falling down or caving in;

3

> b. A part of a building that is standing, even if it has separated from another part of the building; or
>
> c. A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

(Doc. No. 35-1 at 7.)

Plaintiffs submitted their insurance claim on June 3, 2016. (*Id.*) Defendant retained structural engineer Mike Jundt to investigate the causes of the structural damage. (*Id.* at 8.) On June 17, 2016, Jundt concluded Truss Line 2 failed "as the result of a hidden anomaly present in the natural occurring wood member material and the degradation of the wood fibers due to the daily and seasonal cycling of temperature and humidity." (*Id.*) Jundt concluded, meanwhile, that Truss Line 5 failed "as a result of the combination of a defective method of construction and the degradation of the wood fibers due to the daily and seasonal cycling of temperature and humidity." (*Id.*) Specifically, Jundt concluded that the most likely reason for Truss Line 5's failure was the method of construction used to create the steel side plate connection. (Doc. No. 37 at 30–31.) According to Jundt, welding side plates to connect bolts to the wooden beams is a common practice in the construction industry but it creates a connection that is "unable to adapt to the changing geometry of a large wood timber truss exposed to gravity loads over it[ ]s anticipated life." (*Id.* at 32.) Additionally, Jundt concluded that plaintiffs' efforts to shore up the trusses prevented further failures in the roof trusses which could have led to complete collapse with little further warning. (*See id.* at 15, 29.)

In a letter dated June 13, 2016, defendant's third party claims administrator advised plaintiffs that it had assigned Jundt to investigate the loss, but noted that "since the roof did not collapse the additional coverage under your policy for collapse does not apply." (*Id.* at 42.) Over the next several months, defendant continued to investigate the causes of the truss failures, communicating this to plaintiffs in July and August 2016. (*Id.* at 52–54, 57.) Nevertheless, in an August 16, 2016 letter to the plaintiffs, defendant reiterated its position that the additional coverage did not apply because the roof did not collapse. (*Id.* at 56.) Defendant retained attorney John Feeley, on August 25, 2016 to provide a coverage analysis for plaintiffs' claim. (*Id.* at 58.)

Attorney Feeley wrote a letter to defendant on September 9, 2016, noting that "to the extent wear and tear, deterioration, or cracking/shrinking/expansion, were causes of the loss, such causes are excluded by the 'wear and tear,' 'cracking, shrinking or expansion' and 'deterioration' exclusions. (*Id.* at 60.) Feeley also advised defendant that the "hidden or latent defect," the "repeated seepage," and the "weather conditions" exclusion should apply. (*Id.* at 61, 66.) Feeley's letter also concluded that the policy's collapse coverage did not apply in this instance because the roof had not collapsed. (*Id.* at 69.)

Defendant denied the insurance claim on September 14, 2016, citing exclusions for "wear and tear," "deterioration," "hidden or latent defect," "any quality in property that causes it to damage or destroy itself," "settling, cracking, shrinking or expansion," "seepage or leakage of water," and "weather conditions." (Doc. No. 35-1 at 8–9.) The defendant also asserted that because the ceiling and roof of the property "had not fallen down . . . there has been no 'collapse,'" because the building was still standing. (*Id.* at 9.) Therefore, defendant asserted that the "collapse" coverage did not apply at all. (*Id.*)

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact

actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Wool v. Tandem Computs., Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Cty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Undisputed facts are taken as true for purposes of a motion for summary judgment. *Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 745 (9th Cir. 2010). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

**ANALYSIS**

In moving for summary judgment, defendant argues that the additional coverage provision for collapse does not apply in this case because the insured building is still standing and has not fallen to the ground. (Doc. No. 18 at 17–22.) Further, defendant maintains that because there is no coverage, plaintiffs' claim of breach of the implied covenant of good faith and fair dealing fails as well. (*Id.* at 22.) Even were there to be a triable issue of fact on the issue of coverage under the insurance policy, defendant maintains that it is entitled to summary judgment in its favor on plaintiffs' claim of breach of the implied covenant of good faith and fair dealing under the genuine dispute rule and given its' advice of counsel defense. (*Id.* at 23–24.) In moving for summary judgment in their favor, plaintiffs assert that under the undisputed facts the building sustained an "abrupt collapse" within the meaning of the insurance contract. (Doc. No. 24 at 12–16.) According to plaintiffs, the contract covers damages related to a partial collapse and not merely circumstances where a building has collapsed completely and fallen to the ground. (*Id.*)[3]

  *A.*   *Breach of Contract*

The court's first task is to determine what is covered by the collapse provision of the insurance contract and particularly whether coverage exists only, as defendant asserts, where the insured structure has fallen to the ground. The phrase used in the insurance contract at issue here is "abrupt collapse," which the contract defines as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." (*See* Doc. No. 33 at 206.) In this diversity action, the court's role in construing the insurance contract is to discern how the California Supreme Court would

---

[3] Plaintiffs also claim that coverage is triggered by how the trusses failed and that the exclusions cited by defendant in denying coverage do not apply. (Doc. No. 24 at 16–19.) In neither its opposition to plaintiffs' motion for summary judgment nor its own motion for summary judgment does defendant argue that any exclusions apply to coverage under the collapse provision. Indeed, defendant notes in its own motion that, while certain exclusions barred coverage under the main policy, it understands plaintiffs' complaint to be predicated solely on the additional coverage provision for collapse. (*See* Doc. No. 18 at 7 n.1.) It therefore appears to the court that any exclusions present in the policy do not pertain to the issue of coverage under the policy's additional collapse provision. Accordingly, the court will not discuss these exclusions further.

interpret this provision, if presented to it. *See Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 812 (9th Cir. 2002) ("When a decision turns on applicable state law and the state's highest court has not adjudicated the issue, a federal court must make a reasonable determination of the result the highest state court would reach if it were deciding the case.") (quoting *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 885 n.7 (9th Cir. 2000)); *see also Aetna Casualty & Surety Co., v. Sheft*, 989 F.2d 1105, 1108 (9th Cir. 1993); *Nammo Talley Inc. v. Allstate Ins. Co.*, 99 F. Supp.3d 999, 1003 (D. Az. 2015).

The issue of coverage under insurance policy provisions for "collapse" has been litigated with some frequency in California courts. As the California Court of Appeals has noted in one relatively recent case:

> There is a split of authorities over the scope of collapse coverage when the policies leave the term "collapse" undefined. "Insurance companies reacted by defining 'collapse' and elaborating the provisions in an attempt to make the scope of coverage clearer. This effort has met with limited success, as courts continue to grapple with disputes regarding the nature and scope of coverage. Consequently, the split in authority continues. One line of case law holds that 'collapse' requires a complete falling down or flattening to rubble before the loss becomes insured. The other lines of cases (which has been termed the 'modern' and 'majority' view) holds that the building need not entirely or even partially fall down in order for damage to rise to the level of a collapse. Rather, the property is deemed to have collapsed if the damage materially impairs the basic structure or substantial integrity of the building." (5 New Appleman on Insurance Law (Library ed. 2015) § 45.06[1], pp. 45-34 to 45-35, fns. omitted (New Appleman); see 10A Couch on Insurance (3d ed. 2005) § 148:54, pp. 148-93 to 148-96 (rel. 12/98).)
>
> As here, insurance companies have inserted "ever more explicit language in attempts to narrow the scope of [collapse] coverage." (5 New Appleman, *supra*, § 45.06[2][b], p. 45-41.) "For the most part, courts have found such provisions to be unambiguous and enforced them to exclude damage to a building unless and until some part of the building has actually fallen down or been reduced to rubble." (*Id*. at p. 45–41.)

*Grebow v. Mercury Ins. Co.*, 241 Cal. App. 4th 564, 572–73 (2015). Collapse coverage varies based on the specific language used in the insurance contract. *See Tustin Field Gas & Food, Inc. v. Mid-Century Ins. Co.*, 13 Cal. App. 5th 220, 227 (2017) ("The definition of collapse in insurance policies varies."). For example, collapse coverage has sometimes been extended to

8

both actual and imminent collapse, and sometimes only to actual collapse, depending on the language of the policy. *Compare Doheny West Homeowners' Ass'n v. Am. Guar. & Liab. Ins. Co.*, 60 Cal. App. 4th 400, 406 (1997) (finding that the policy's language was ambiguous and therefore covered both actual and imminent collapse) *with Rosen v. State Farm Gen. Ins. Co.*, 30 Cal. 4th 1070, 1075–76, 1080 (2003) (distinguishing *Doheny* and noting that where the provisions unambiguously cover only actual collapse, no coverage may be found for imminent collapse); *see also Jordan v. Allstate Ins. Co.*, 116 Cal. App. 4th 1206, 1221–22 (2004) (holding that where policy refers to an "entire collapse," the collapse must be actual rather than imminent). It is therefore clear that the coverage limits of any particular policy must be gleaned strictly from the language used in the particular insurance policy at issue.

Because the extent of collapse coverage depends on the precise policy language, cases interpreting collapse provisions with language different from this policy or that leave the term "collapse" undefined are of limited utility. Neither party has pointed the court to California case law discussing the meaning of the term "abrupt collapse" as defined in the contract in this case, and the court has found no such authority. Indeed, the precise coverage definition here has been referenced in few other cases and, even where it does appear, has largely not been a focal point of discussion. The one court in the Ninth Circuit to directly address the meaning of the precise language used in this policy held that coverage exists if a part of the building has suffered "a substantial impairment to the structural integrity of the property." *Malbco Holdings, LLC v. AMCO Ins. Co.*, 719 F. Supp. 2d 1311, 1314–16 (D. Or. 2010). However, the court in *Malbco* was interpreting Oregon law, again limiting the utility of that opinion.[4]

Given the lack of directly relevant authority, the court turns to more general principles of insurance policy interpretation under California law. Insurance policies are construed under the typical rules of contract law, which require looking "first to the language of the contract in order

---

[4] The parties cite several cases from courts around the country interpreting collapse provisions, some of which found coverage and some which found no coverage. Since the court's task here is to make a reasonable determination of how the California Supreme Court would likely interpret the specific provision in *this* insurance policy, *see Med. Lab. Mgmt. Consultants*, 306 F.3d at 812, these cases—all of which concern the insurance law of states other than California and collapse provisions with different language than the policy at issue here—have little persuasive value.

to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995), *as modified on denial of reh'g* (Oct. 26, 1995). The goal of a court construing an insurance contract "is to give effect to the parties' mutual intentions." *Minkler v. Safeco Ins. Co. of Am.*, 49 Cal. 4th 315, 321 (2010) (quoting *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992)). Terms in a contract are ambiguous if they are "susceptible of more than one reasonable interpretation." *Id.*; *see also Waller*, 11 Cal. 4th at 18. However, "language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract." *Id.* Ambiguities in coverage under California insurance law are typically construed against the insurance company. *E.M.M.I. v. Zurich Am. Ins. Co.*, 32 Cal. 4th 465, 471 (2004) ("Any ambiguous terms are resolved in the insureds' favor, consistent with the insureds' reasonable expectations.") (quoting *Safeco Ins. Co. v. Robert S.*, 26 Cal. 4th 758, 763 (2001)); *see also Minkler*, 49 Cal. 4th at 322 ("[B]asic coverage provisions are construed broadly in favor of affording protection, but clauses setting forth specific exclusions from coverage are interpreted narrowly against the insurer.").

With these general principles in mind, the court turns to the language of the contract at issue to determine whether it is ambiguous. This insurance contract defines "abrupt collapse" as being an "abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." (Doc. No. 33 at 206.) It further provides that this coverage does not extend to

> a. A building or any part of a building that is in danger of falling down or caving in; b. A part of a building that is standing, even if it has separated from another part of the building; or c. A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

(*Id.*)

The court concludes that the language of this policy is ambiguous because there is more than one reasonable interpretation of its intended meaning. One reasonable meaning of "caving in" is defendant's understanding: that the building has completely collapsed to the ground. The policy does attempt to differentiate between a building that has suffered an "abrupt collapse" and one that is standing. This suggests—even though, as explained below, it does not unambiguously

10

require—that the building or part of the building must collapse completely to the ground.

However, in common parlance, a building can "cav[e] in . . . with the result that the building . . . cannot be occupied for its intended purpose" (Doc. No. 33 at 206) by having its roof or ceiling fall an appreciable distance, even if the building as a whole has not completely collapsed to the ground. Nothing in the policy unambiguously informs the insured that the building or a part thereof must fall completely to the ground to be covered. The term used by the contract is "abrupt collapse," which highlights the *manner* in which the collapse must occur to warrant coverage. *See, e.g.*, *Ass'n of Unit Owners of Nestani v. State Farm Fire & Cas. Co.*, 670 F. Supp. 2d 1156, 1163 (D. Or. 2009) (noting a policy covering "sudden" collapse has a "temporal element"). The contract does not use the term "complete collapse," which would more readily refer to the *degree* of collapse. The fact that coverage applies to the "abrupt" collapse of either "a building" or "any part of a building" strongly suggests the policy was intended to cover a partial collapse of parts of the building, so long as it occurred abruptly, not only total or complete collapse. Moreover, specifying that the collapse must render the building or part of the building so that it "cannot be occupied for its intended purpose" would be unnecessary and redundant if the policy required the building or part of the building to have collapsed to the ground. A building or part of a building that has collapsed to the ground cannot be occupied at all for any purpose, let alone for its intended purpose, and contracts are usually interpreted to avoid redundancy. *See, e.g.*, *ACL Techs., Inc. v. Northbrook Prop. & Cas. Ins. Co.*, 17 Cal. App. 4th 1773, 1785 (1993) ("In California, however, contracts—even insurance contracts—are construed to avoid rendering terms surplusage."). In sum, no language in this contract unambiguously requires a building or a part of the building to fall "to the ground" in order for coverage to apply, as defendant now asserts.

Having concluded the policy language is ambiguous as to coverage, California law requires that the contract be interpreted in favor of the insured and against the insurer. *See Minkler*, 49 Cal. 4th at 322; *E.M.M.I.*, 32 Cal. 4th at 471; *Safeco Ins. Co.*, 26 Cal. 4th at 763. A layperson would reasonably interpret this policy to provide coverage for partial collapses of parts of a building that render the building unusable, even if the building or that particular part had not

11

fallen completely to the ground. (*See* Doc. No. 33 at 206) (stating that an "abrupt collapse" occurs when "any part of a building" has "fall[en] down" or "cav[ed] in" and "the building or part of the building cannot be occupied for its intended purpose").

It is undisputed here that the overhead monitors, the disco ball, and the entire ceiling of the building fell six to ten inches. (Doc. No. 35-1 at 2.) It is also undisputed that ceiling tiles and insulation fell to the tabletops and counters below. (*Id.*) These events constitute "any part of a building" that has "fall[en] down." Finally, it is undisputed that the business was closed by the County of Madera for public safety reasons until repairs could be completed and thus neither the building nor any part of it could be occupied for its intended purpose. (*Id.* at 3–4.) Therefore, there is no genuine dispute of material fact about whether a part of the building fell down and whether the building could be occupied for its intended purpose. Because the policy language is interpreted in favor of the insured, these facts are sufficient to establish coverage. Similarly, interpreting the policy in favor of the insured, the language of the policy stating coverage does not extend to parts of the building that are standing "even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion" can be reasonably read as intending to exclude coverage for any regular maintenance costs, not as requiring a complete collapse for coverage to exist. *See, e.g.*, *Stamm Theatres, Inc. v. Hartford Cas. Ins. Co.*, 93 Cal. App. 4th 531, 541 (2001) (noting defendant had contended a broad definition of a particular term "would transform the policy into a maintenance agreement," and observing that "[t]he coverage provisions at issue come into play only when a building is in a state of collapse, well beyond the point at which ordinary maintenance would be called for"). To the extent the policy excludes coverage for buildings that are "standing," the failure to define that term combined with the definition of "abrupt collapse" creates an ambiguity that must be resolved against defendant here. For these reasons, the court concludes plaintiffs' motion for summary judgment should be granted[5] and defendant's motion for summary judgment should be denied as to plaintiffs' breach

---

[5] The insurance contract also requires the collapse to have occurred from a specified list of causes: (1) "[b]uilding decay"; (2) "[i]nsect or vermin damage"; or (3) "[u]se of defective material or methods in construction remodeling or renovation." (Doc. No. 35-1 at 7.) The parties do not dispute that the structural engineer who evaluated the building concluded that the failure in

12

of contract claim.

B.     *Breach of the Implied Covenant of Good Faith and Fair Dealing*

Defendant also moves for summary judgment in its favor as to plaintiffs' claim that defendant breached the implied covenant of good faith and fair dealing. (Doc. No. 18 at 22–26.) Plaintiffs do not move for summary judgment on this claim. (Doc. No. 24 at 5.) As the undersigned believes the discussion above makes clear, summary judgment must be granted in favor of defendant on this claim because its decision to withhold payment was based on a genuine dispute about coverage.

California has a well-established cause of action sounding in tort, rather than contract, against an insurer who breaches the implied covenant of good faith and fair dealing with its insured, when it "unreasonably and in bad faith withholds payment of the claim of its insured." *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 683–85 (1988) (en banc) (quoting *Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 575 (1973)). For an insurer to fulfill its obligations, it "must give at least as much consideration to the latter's interests as it does to its own." *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 818–19 (1979) (en banc). "While an insurance company has no obligation under the implied covenant of good faith and fair dealing to pay every claim its insured makes, the insurer cannot deny the claim 'without fully investigating the grounds for its denial.'" *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 720–21 (2007) (quoting *Frommoethelydo v. Fire Ins. Exch.*, 42 Cal. 3d 208, 215 (1986) (en banc)). The ultimate question in considering a bad faith claim is "whether the refusal to pay policy benefits was unreasonable." *Ospal v. United Servs. Auto. Ass'n*, 2 Cal. App. 4th 1197, 1205 (1991) (quoting *Austero v. Nat'l Cas. Co.*, 84 Cal. App. 3d 1, 32 (1978)) (emphasis omitted); *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 347 (2001) ("[B]efore an insurer can be found to have acted tortiously (i.e., in bad faith), for its delay or denial in the payment of policy benefits, it must be

---

Truss Line 2 was "the result of a hidden anomaly present in the natural occurring wood member material and the degradation of the wood fibers due to the daily and seasonal cycling of temperature and humidity," while the failure in Truss Line 5 was "a result of the combination of a defective method of construction and the degradation of the wood fibers due to the daily and seasonal cycling of temperature and humidity." (Doc. No. 35-1 at 8.) These appear to fit within the contractual list of causes, and defendants have not argued or suggested otherwise.

13

shown that the insurer acted *unreasonably or without proper cause*.") (emphasis added).

Breaches of the implied covenant of good faith and fair dealing in the insurance context are subject to the "genuine dispute rule." As explained by the California Supreme Court:

> [A]n insurer's denial of or delay in paying benefits gives rise to tort damages only if the insured shows the denial or delay was unreasonable. As a close corollary of that principle, it has been said that an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract.
>
> The genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim. A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds. Nor does the rule alter the standards for deciding and reviewing motions for summary judgment. The genuine issue rule in the context of bad faith claims allows a trial court to grant summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable—for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law. On the other hand, an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably. Thus, an insurer is entitled to summary judgment based on a genuine dispute over coverage or the value of the insured's claim only where the summary judgment record demonstrates the absence of triable issues as to whether the disputed position upon which the insurer denied the claim was reached reasonably and in good faith.

*Wilson*, 42 Cal. 4th at 723–24 (internal citations and quotations omitted). In particular, where language in an insurance policy is ambiguous, summary judgment is appropriately granted so long as the insurer is reasonable in its interpretation of the policy language. *See Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1162 (9th Cir. 2002); *cf. Lunsford v. Am. Guar. & Liab. Ins. Co.*, 18 F.3d 653, 656 (9th Cir. 1994) (concluding that summary judgment was appropriate where a decision not to defend under an insurance policy was based on an investigation of the claim and "a reasonable construction of the policy," despite a finding that the policy was ambiguous as to coverage).

In this case, the basic facts are essentially undisputed. As discussed above, the language of the insurance contract at issue is ambiguous and susceptible of differing but reasonable

14

interpretations. One such reasonable interpretation is that the collapse provision required the building to completely collapse to the ground, as evidenced by the language excluding coverage for structures that remain standing. It is undisputed here that the building did not completely collapse to the ground which, under defendant's interpretation, would mean there was no coverage under the policy. While plaintiffs contend that defendant formed this view at the outset of the claims process prior to conducting any investigation (*see* Doc. No. 37 at 42, 56), that is irrelevant, even if true. It is undisputed that the building did not fall to the ground, and nothing about the investigation would or could have impacted a coverage decision based on defendant's interpretation of the policy. While defendant's interpretation ultimately proved to be incorrect in this court's view, given the ambiguity of the contract and the manner in which California law requires such an ambiguity to be construed, this does not make the initial coverage decision unreasonable. *See Chateau Chamberay Homeowners Ass'n*, 90 Cal. App. 4th at 347 (holding insurer can only be found liable on bad faith claim if "the insurer acted unreasonably or without proper cause"); *Ospal*, 2 Cal. App. 4th at 1205 (noting the ultimate question in a bad faith claim is "whether the refusal to pay policy benefits was unreasonable"). Since, even under plaintiff's version of the facts here, "a genuine issue as to the insurer's liability under California law" existed, *Wilson*, 42 Cal. 4th at 724, defendant is entitled to summary judgment in its favor as to plaintiffs' bad faith claim. *See Amadeo*, 290 F.3d at 1162; *Lunsford*, 18 F.3d at 656.

**CONCLUSION**

For these reasons, plaintiffs' motion for summary judgment (Doc. No. 23) is granted. Defendant's motion for summary judgment (Doc. No. 17) is denied in part and granted in part.

IT IS SO ORDERED.

Dated: __**August 15, 2018**__         _____
UNITED STATES DISTRICT JUDGE